**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| CITY OF ADELANTO,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); AGC CHEMICALS AMERICAS INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; JOHN DOE DEFENDANTS 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; KIDDE PLC, INC.; KIDDE-FENWAL, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS LP; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC.,<br><br>Defendants. | MDL No.: 2873<br><br>Master Docket No.: 2:18-mn-2873-RMG<br><br>JUDGE RICHARD M. GERGEL<br><br>Civil Case No.: 2:22-cv-03591-RMG<br><br>DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, City of Adelanto ("Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), Kidde-Fenwal, Inc., Kidde

1

PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), Nation Ford Chemical Company, National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation,  Chemicals Incorporated, AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## I.     SUMMARY OF THE CASE

1.      Plaintiff brings this action against Defendants to recover any and all past and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring of the ongoing contamination of its surface water, groundwater, wells, infrastructures, facilities, and properties caused and/or created by Defendants' products, punitive damages, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

2.      Plaintiff, City of Adelanto, is a municipal corporation created pursuant to the laws of the State of California.

3.      Plaintiff owns California Public Water System #3610001.  Plaintiff, through the Adelanto Public Utility Authority ("APUA"), is responsible for providing potable water to individuals and businesses within its service area.

4.      Plaintiff also owns the Adelanto Wastewater Treatment Plant. Plaintiff, through the APUA, is responsible providing wastewater treatment services for the residents and customers of the City of Adelanto.

5.      Plaintiff has a property interest in the water and wastewater it appropriates, purchases, reclaims, treats, stores, and distributes, as well as its water sources, water supplies, wells, piping, distribution system, water treatment systems, wastewater treatment systems, stormwater systems, and all other lands, properties and facilities owned and/or operated by Plaintiff (collectively, "Plaintiff's Property").

6.      Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), have been detected in Plaintiff's Property, including Plaintiff's drinking water supply and wastewater.

7.      PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

8.      At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold PFOS, PFOA, the chemical precursors of PFOS and/or PFOA, and/or products containing PFOS, PFOA, and/or their chemical precursors (collectively, "Fluorosurfactant Products"), and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products.

9.      Defendants' Fluorosurfactant Products include, but are not limited to, Teflon, Scotchguard, waterproofing compounds, stainproofing compounds, paper and cloth coatings, waxes, aqueous film-forming foam ("AFFF"), and various other products.

10.     AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

11.     Upon information and belief, AFFF has been stored, used, and/or disposed of at sites in and around Plaintiff's Property, including Plaintiff's water sources. These sites include, but are not limited to, the Southern California Logistics Airport and the former George Air Force Base.

12.     Defendants' AFFF contained PFOS, PFOA, and/or the chemical precursors to PFOS and/or PFOA.

13.     Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment during the intended use of these Products, even when used as directed or intended by Defendants.

14.     Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, released, and/or disposed of at, near, and/or in the vicinity of Plaintiff's Property, including Plaintiff's water supplies. During these activities, Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFAS to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

15.     As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFAS have been detected in Plaintiff's Property, thereby contaminating Plaintiff's Property and causing damage to Plaintiff.

16.     Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

17.     At all times pertinent herein, Plaintiff did not know, nor should Plaintiff have known, of the ongoing contamination of its Property through the use, release, storage, and/or disposal of

4

Defendants' Fluorosurfactant Products as Defendants did not disclose the toxic nature and harmful effects of these Fluorosurfactant Products.

18.     Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, filter, dispose of, treat, and monitor the PFAS contamination of Plaintiff's Property caused by the use, release, storage, and/or disposal of Defendants' Fluorosurfactant Products at, around, and/or in the vicinity of Plaintiff's Property, as well as any and all other damages recoverable under applicable state and/or federal laws. Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, as well as punitive damages and reasonable attorneys' fees and costs.

## II.     PARTIES

19.     Plaintiff, City of Adelanto, is a municipal corporation established under and pursuant to the laws of the State of California. Plaintiff's principal address is 11600 Air Expressway, Adelanto, CA 92301.

20.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property:

    a.   Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in California, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. Upon information and belief, 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including California.

    b.   Defendant E. I. DuPont De Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road,

Wilmington, Delaware 19805.  Old DuPont is registered to do business in the State of California.

c.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours is registered to do business in the State of California.

d.  In 2015, Old DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e.  Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899.  Chemours FC is registered to do business in the State of California.

f.  Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.  Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and Old DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New

DuPont"). New DuPont is believed to have assumed some of the PFAS liabilities of Old DuPont. Upon information and belief, New DuPont does and/or has done business throughout the United States, including California.

g.  Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of Old DuPont. Corteva, Inc. is registered to do business in California.

h.  Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard does and/or has done business throughout the United States, including in the State of California.

i.  Upon information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of California.

j.  Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.  Tyco acquired Chemguard in 2011.

k.  Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon

information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in the State of California.

l.  Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101.  Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc.  Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. (collectively, "Kidde/Kidde Fire").  Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in the State of California.

m.  Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032.  Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in the State of California.

n.  Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.  Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

o.  Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach

Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in California.

p.  Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Global Corporation is registered to do business in California.

q.  Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. Raytheon Tech f/k/a United Tech is registered to do business in California.

r.  Defendant National Foam, Inc. is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam, Inc. is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam, Inc. manufactures the Angus brand of AFFF products. National Foam, Inc. does and/or has done business throughout the United States, including in the State of California.

s.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.  Buckeye is registered to do business in California.

t.  Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is registered to do business in California.

u.  Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.  Upon information

and belief, BASF Corporation acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.  BASF Corporation is registered to do business in California. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including California.

v.   Defendant ChemDesign Products, Inc. ("CDPI") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, CDPI conducts and/or avails itself of doing business throughout the United States, including California.

w.   Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant Corporation is registered to do business in California.

x.   Defendant Chemicals Incorporated is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Chemicals Incorporated is registered to do business in California.

y.   Defendant Nation Ford Chemical Company is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, Nation Ford Chemical Company conducts and/or avails itself of doing business throughout the United States, including California.

z.   Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a

subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.  AGC America is registered to do business in California.

aa. Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

bb. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, Deepwater conducts and/or avails itself of doing business throughout the United States, including California.

cc. Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. In 1991, Dynax Corporation entered the market, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in AFFF. Upon information and belief, Dynax Corporation conducts and/or avails itself of doing business throughout the United States, including California.

dd. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

ee. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma

Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Upon information and belief, Archroma U.S., Inc. conducts and/or avails itself of doing business throughout the United States, including California.

ff. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

21.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

22.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## III. JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

24.     Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing

in the United States District Court for the District of South Carolina, Charleston Division, Plaintiff would have filed this Complaint in the United States District Court for the Central District of California, Eastern Division. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the Central District of California, Eastern Division, as the "Home Venue" as this case may have originally been filed there.

25.    Venue is proper in the United States District Court for the Central District of California, Eastern Division, pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. THE CONTAMINANTS: PFOA & PFOS.

26.    PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

27.    PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

---

[1] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

28.    PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[2]

29.    PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

30.    Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

31.    According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

32.    EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[5]

33.    EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically

---

[2] See EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.
[3] See EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.
[4] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[5] See "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[6]

34.     In 2016, EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water.  When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

35.     On June 15, 2022, EPA issued interim, updated drinking water health advisories of 0.004 ppt for PFOA and 0.02 ppt PFOS that replace those EPA issued in 2016.[7]

36.     The State of California's Division of Drinking Water established notification levels of 6.5 ppt for PFOS and 5.1 ppt for PFOA, and lowered the State's response levels from 70 ppt for PFOS and PFOA, to 40 ppt for PFOS and 10 ppt for PFOA.

**B.  AQUEOUS FILM-FORMING FOAM.**

37.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

38.     The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

39.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

40.     Upon information and belief, from the 1960s through the mid-2000s, 3M manufactured, designed, marketed, distributed, and sold AFFF containing PFOS, PFOA, and/or their chemical precursors within the United States, and raw materials containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

41.     All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization and/or manufactured AFFF containing fluorosurfactants manufactured

---

[6] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[7] *See* "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA 822-F-22-002, available at https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan.

through the process of telemerization. Telemerization produces fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

42.     Upon information and belief, by the early 1970s, National Foam and Tyco/Ansul began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States.

43.     Upon information and belief, by the 1980s, Chemguard began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States, and fluorosurfactants containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

44.     Upon information and belief, by the 1990s, Buckeye began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States

45.     AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

46.     AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion.

47.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

48.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in

16

the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

49.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff's Property.

50.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff's Property.

**C.  DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS.**

51.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

52.     Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

53.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[8]

54.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

55.     In 1981, Old DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. Old DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[9]

56.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[10]

57.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

---

[8] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[9] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[10] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

58.    After 3M exited the AFFF market in the United States, the remaining AFFF manufacturer Defendants continued to manufacture and sell AFFF containing PFOA and/or its chemical precursors.

59.    From 1951, Old DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

60.    Based on information and belief, by no later than 2001, Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks containing or degrading into PFOA to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Municipal Plaintiff's Properties.

61.    Old DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[11]

62.    By December 2005, the EPA uncovered evidence that Old DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[12]   The EPA fined Old DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA

---

[11] *See, e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.
[12] $16.5 million.

substantial risk information about chemicals they manufacture, process or distribute in commerce."[13]

63.     By July 2011, Old DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over Old DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified Old DuPont of a "probable link"[14] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[15]   By October 2012, the C8 Science Panel had notified Old DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

64.     In July 2015, Old DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by Old DuPont. By mid-2015, Old DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

65.     Defendants knew, or reasonably should have known, at all times relevant to this action that it was substantially certain that their acts and omissions as set forth herein would threaten public health, cause extensive contamination of Municipal Plaintiff's Properties and natural resources, and otherwise cause the injuries described herein.

---

[13] U.S. Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on January 30, 2018).
[14] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.
[15] See The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on January 28, 2018).

66.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, and groundwater in and around the Municipal Plaintiff's Properties; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the Fluorosurfactant Products.

67.    As a direct result of Defendants' acts and omissions alleged in this Complaint, Municipal Plaintiff's Properties have been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated.  As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFOA and PFOS contamination on Municipal Plaintiff's Properties at significant expense, loss and damage.

68.    Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

### D. OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM ITS PFAS LIABILITIES.

69.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

70.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

71.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

72.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

73.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

74.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

75.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

76.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

77.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

78.     Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

79.     Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

80.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly

formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

81.     Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

82.     By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

83.     Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

84.     Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

**E. THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S PROPERTY.**

85.     PFAS have been detected in varying amounts, at varying times in Plaintiff's Property. PFOA and PFOS have been detected and/or are present in certain of areas of Plaintiff's Property. PFOA and PFOS have been detected at Plaintiff's Property at levels that are greater than the current State and/or Federal Advisory Levels. The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, in Plaintiff's Property in varying amounts and at varying times has resulted, and will continue to result, in significant costs, injuries and damage to Plaintiff.

86.     Upon information and belief, the invasion of Plaintiff's Property with PFOA and PFOS is recurring, resulting in new harm to Plaintiff on each occasion.

87.     The injuries to Plaintiff caused by Defendants' conduct and Fluorosurfactant Products, including but not limited to AFFF, constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

### FIRST CAUSE OF ACTION
STRICT LIABILITY – DEFECTIVE DESIGN – CONSUMER EXPECTATION TEST

88.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

89.     Plaintiff was harmed by Fluorosurfactant Products which were designed, manufactured, formulated, marketed, sold and/or distributed by Defendants, or that Defendants assumed or acquired liabilities for, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

90.     Defendants' Fluorosurfactant Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

91.     Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

92.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

93.     Defendants' Fluorosurfactant Products used on or in the vicinity of Plaintiff's Property were used in a reasonably foreseeable manner and without substantial change in the condition in which the Products were sold.

94.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA, PFOS, and/or their chemical precursors into the surface water, soil, and groundwater.

95.     Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

96.     Plaintiff was, is, and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

97.     Defendants' Fluorosurfactant Products' failure to perform safely was a substantial factor in causing Plaintiff's harm.

98.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## SECOND CAUSE OF ACTION
### STRICT LIABILITY – DESIGN DEFECT – RISK-BENEFIT TEST

99.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

100.     Plaintiff was harmed by Fluorosurfactant Products that were designed, manufactured, marketed, sold, and/or distributed by Defendants, or that Defendants assumed or acquired liabilities for.

101.     Plaintiff was, is, and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

102.     The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiff.

103.     The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFOA and PFOS contamination is widespread, persistent, and toxic.

104.     The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

105.     At the time of manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in products.

106.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

107.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

**THIRD CAUSE OF ACTION**
STRICT LIABILITY – FAILURE TO WARN

108.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

109.    As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and PFOS.

110.    Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

111.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

112.    Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Plaintiff's Property.

113.    Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

114.    Defendants' Fluorosurfactant Products used on and/or in the vicinity of Plaintiff's Property were defective in design and unreasonably dangerous for the reasons set forth above.

115.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products at, near, and/or in the vicinity of Plaintiff's Property, including contamination of Plaintiff's Property with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

28

116.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

117.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## FOURTH CAUSE OF ACTION
PUBLIC NUISANCE

118.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

119.    Defendants designed, manufactured, distributed, marketed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products in a manner that created, or participated in creating, a public nuisance that unreasonably and substantially interferes with the use and enjoyment of Plaintiff's Property, and unreasonably endangers or injures the health, safety, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

120.    The unreasonable and substantial interference with the use and enjoyment of Plaintiff's Property includes but is not limited to: the contamination of Plaintiff's Property, including Plaintiff's water supply source, with PFOS, PFOA, and/or their chemical precursors; and the exposure to known toxic chemicals manufactured and/or sold by Defendants.

121.    The presence of PFOS, PFOA, and/or their chemical precursors causes significant costs, inconvenience, and annoyance to Plaintiff, who is charged with supplying potable drinking water to residents and businesses in Plaintiff's service area.

122.    The contamination affects a substantial number of people who rely upon Plaintiff for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

123.    The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing Fluorosurfactant Products and concealing the dangers those Products posed to human health and the environment.

124.    As a result of the actual and threatened PFOA and PFOS contamination caused by Defendants' conduct, Plaintiff has suffered, and will continue to suffer, harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred, and will continue to incur, substantial costs to remove the contamination from its Property.

125.    Plaintiff did not consent to the conduct that resulted in the contamination of its Property.

126.    Defendants' conduct was a substantial factor in causing the harm to Plaintiff.

127.    Defendants have, by their acts and omissions set forth above, among other things, knowingly unleashed long-lasting and ongoing PFOS and PFOA contamination, and threat of PFOS and PFOA contamination, upon Plaintiff's Property.

128.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property.

129.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment,

testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

### FIFTH CAUSE OF ACTION
PRIVATE NUISANCE

130.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

131.     Plaintiff's Property has been, and continues to be, contaminated by PFOS, PFOA, and/or their chemical precursors as a direct and proximate result of the acts and omissions of Defendants as set forth above.

132.     Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the ordinary safety, use, benefit, and/or enjoyment of Plaintiff's Property.

133.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

### SIXTH CAUSE OF ACTION
TRESPASS

134.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

135.     Plaintiff is the owner and/or actual possessor of Plaintiff's Property and other relevant structures located thereon. Defendants knew, or in the exercise of reasonable care should have

known, that PFOA and/or PFOS contaminates soil, surface, and groundwater, including the property and other rights of Plaintiff.

136.     Defendants failed to properly warn against the use of Fluorosurfactant Products such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate Plaintiff's Property, including but not limited to its soil, sediment, surface water, groundwater, and other structures located thereon.

137.     The contamination of Plaintiff's Property has varied over time and has not yet ceased. PFOA and/or PFOS continue to migrate onto and enter Plaintiff's Property. The contamination is reasonably abatable.

138.     Plaintiff has not consented to, and does not consent to, this trespass or contamination.

139.     Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

140.     Plaintiff was, is, and will continue to be harmed by the entry of Defendants' Fluorosurfactant Products onto its Property.

141.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## SEVENTH CAUSE OF ACTION
NEGLIGENCE – MANUFACTURER OR SUPPLIER – DUTY TO WARN

142.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

143.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, and/or as those who assumed or acquired liabilities for the manufacture and sale of Fluorosurfactant Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

144.    Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

145.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

146.    Plaintiff was, is, and will continue to be harmed.

147.    Defendants' failure to warn or instruct was a substantial factor in causing Plaintiff's harm.

148.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

149.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

### EIGHTH CAUSE OF ACTION
NEGLIGENCE – FAILURE TO RECALL

150.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

151.    Defendants' Fluorosurfactant Products were designed, manufactured, marketed, distributed and sold without adequate warning of toxicity, potential human health risks and environmental hazards.

152.    Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with their Fluorosurfactant Products.

153.    Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

154.    Defendants knew or reasonably should have known that users and third parties would not realize the dangers.

155.    Defendants became aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products by no later than the year 2000.

156.    Defendants failed to recall their Fluorosurfactant Products.

157.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of Fluorosurfactant Products.

158.    Plaintiff was, is, and will continue to be harmed.

159.    Defendants' failure to recall their Fluorosurfactant Products was a substantial factor in causing Plaintiff's harm.

160.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

161.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## NINTH CAUSE OF ACTION
### LIABILITY PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1882

162.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

163.    Plaintiff is a public water utility company and operates multiple public water supply systems in California. The groundwater that supplies Plaintiff's wells is property owned or used by Plaintiff to provide utility services. The water pumped from Plaintiff's wells is property owned or used by Plaintiff to provide utility services.

164.    California Civil Code Section 1882.1 states, "[a] utility may bring a civil action for damages against any person who commits, authorizes, solicits, aids, abets, or attempts any of the following acts:

    a.  Diverts, or causes to be diverted, utility services by any means whatsoever.

    b.  Makes, or causes to be made, any connection or reconnection with property owned or used by the utility to provide utility service without the authorization or consent of the utility.

    c.  Prevents any utility meter, or other device used in determining the charge for utility services, from accurately performing its measuring function by tampering or by any other means.

    d.  Tampers with any property owned or used by the utility to provide utility services.

    e.  Uses or receives the direct benefit of all, or a portion, of the utility service with knowledge of, or reason to believe that, the diversion, tampering, or unauthorized connection existed at the time of the use, or that the use or receipt, was without the authorization or consent of the utility."

165.    By causing the introduction of PFOS, PFOA, and/or their chemical precursors into Plaintiff's wells and the groundwater that supplies those wells, Defendants injured, altered, interfered with, and/or otherwise prevented property owned or used by Plaintiff from performing its normal or customary function in Plaintiff's provision of utility services.

166.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating,

maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

167.    "In any civil action brought pursuant to Section 1882.1, the utility may recover as damages three times the amount of actual damages, if any, plus the cost of the suit and reasonable attorney's fees."  California Civil Code Section 1882.2.

<b><u>TENTH CAUSE OF ACTION</u></b><br>VIOLATION OF THE UNIFORM VOIDABLE TRANSFER ACT<br>(AGAINST UVTA DEFENDANTS ONLY)

168.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

169.    Plaintiff seeks equitable and other relief pursuant to the Uniform Voidable Transfer Act ("UVTA") as adopted by the State of California in Cal. Civ. Code Ann. § 3439, against Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and New DuPont (collectively, the "UVTA Defendants").

170.    Pursuant to Cal. Civ. Code Ann. § 3439, "[a] transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

    a.    With actual intent to hinder, delay, or defraud any creditor of the debtor;

    b.    Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor either:

        i.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

        ii.   Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

171.     Further, Cal. Civ. Code Ann. § 3439 states that, "[i]n determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any and all of the following: to all relevant factors including, but not limited to, the following: […] whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; whether the transfer was of substantially all of the debtor's assets; […] whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

172.     Upon information and belief, in February 2014, Old DuPont formed The Chemours Company as a wholly-owned subsidiary and used it to spin off Old DuPont's "Performance Chemicals" business line in July 2015.

173.     Upon information and belief, at the time of the spinoff, Old DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS.

174.     Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

175.     The UVTA Defendants acted with actual intent to hinder, delay and to defraud any creditor of the UVTA Defendants because: (1) they were engaged and or about to engage in a

38

business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business and; (2) intended to incur, or believed or reasonably should have believed or reasonably should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

176.    The UVTA Defendants engaged in actions in furtherance of a scheme to transfer Old DuPont's assets out of the reach of Plaintiff, and other similar parties, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions described herein.

177.    As a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

178.    Pursuant to Cal. Civ. Code Ann. § 3439.07, Plaintiff seeks avoidance of the transfer of Old DuPont's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiff in this action.

179.    Plaintiff further seeks all other rights and remedies that may be available to it under UVTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## **PUNITIVE DAMAGES**

180.    Under the applicable laws of the State of California, Plaintiff seeks punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:

    a. costs and expenses related to the past, present, and future investigation, sampling, testing, monitoring, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;

    b. costs and expenses related to the past, present, and future treatment, filtration, and remediation of PFAS contamination of Plaintiff's Property;

    c. costs and expenses associated with and related to the removal and disposal of the PFAS contamination from Plaintiff's Property; and

    d. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property.

2. Diminished property value;

3. Consequential damages;

4. Punitive damages;

5. Costs, disbursements, and attorneys' fees of this lawsuit;

6. Pre-judgment and post-judgment interest; and

7. Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

DATED:  October 17, 2022

Respectfully submitted,

Scott Summy (TX Bar 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal (TX Bar 13569600)
Carla Burke Pickrel (TX Bar 24012490)
John Fiske (CA Bar 24256)

-and-

**COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr. (LA Bar 1788)
Darren Sumich (LA Bar 23321)
David A. Parsiola (LA Bar 21005)
Brandon J. Taylor (LA Bar 27662)
Christina Cossich (LA Bar 32407)
Jody Fortunato  (LA Bar 31728)
Luana N. Smith (LA Bar 35534)

*Attorneys for Plaintiff*